# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

CHANNY VAY,                                  :
          Plaintiff,                      :
                               :
          v.                                :          C.A. No. 16-460JJM
                               :
NANCY A. BERRYHILL, ACTING                   :
COMMISSIONER OF SOCIAL SECURITY,             :
          Defendant.                      :

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff Channy Vay was born in Cambodia in 1957. After suffering horrific experiences during the Khmer Rouge regime, including experiencing torture and the deaths of her parents and witnessing the deaths of her siblings, as well as exposure to other unspeakable violence, in 2000, she immigrated to the United States to reunite with her husband, who had thought she was dead. She settled in Rhode Island and, despite being functionally illiterate and unable to communicate in English, worked as a jewelry assembler from 2003 until 2008 and as an electronic product assembler from 2008 until 2012. In May 2012, she was involved in a motor vehicle accident and stopped working; a year later (on July 24, 2013), she applied for Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) of the Social Security Act (the "Act"). Her application was denied following a hearing before an Administrative Law Judge ("ALJ"). During the ALJ hearing, Plaintiff required the assistance of a Cambodian interpreter.

In this case, Plaintiff seeks reversal of the decision of the Commissioner of Social Security (the "Commissioner") denying her DIB application. Defendant Nancy A. Berryhill ("Defendant") has filed a motion for an order affirming the Commissioner's decision. The matter has been referred to me for preliminary review, findings and recommended disposition

pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find that the ALJ

erred in failing to consider the impairment of post-traumatic stress disorder ("PTSD") and in

affording no weight to the opinion of Plaintiff's treating nurse practitioner, instead basing his

Step Two and residual functional capacity ("RFC")[1] determinations on the examining state

agency experts, who did not review the treating and opinion records from CCAP and the October

2014 records from Rhode Island Hospital.  I also find that the ALJ relied on an inadequately

supported finding regarding the training needed for Plaintiff's prior work as a jewelry assembler.

Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner

(ECF No. 11) be granted and the Commissioner's Motion to Affirm Her Decision (ECF No. 17)

be denied.

## I.    **Background**

Plaintiff was 55 years old ("Advanced Age" in Social Security parlance) at the time of her

alleged onset date.  Tr. 75.  She completed the first grade in Cambodia but has not learned to read.

Tr. 157.  She speaks no English.  This language deficit is highly pertinent to the issues presented in

the case: the medical record reflects her challenges in communicating with treating providers; the

consulting examination report reflects the opinion of the Social Security Administration ("SSA")

expert psychologist that, because of the language barrier, "it would be difficult for her to engage in

psychotherapy" to treat her mental impairments, Tr. 405; and the ALJ hearing transcript reflects

repeated misunderstandings and miscommunications culminating in the answer of questionable

reliability that became the foundation for the pivotal finding regarding the skill required for her prior

work.

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

In the aftermath of a May 3, 2012, automobile accident, Plaintiff was treated at Coastal Medical and University Orthopedics for a possible concussion, as well as for neck, right shoulder and arm, leg and back injuries.  E.g., Tr. 208, 321.  In addition to right-side injuries, the treating notes also reflect depression, fatigue and memory loss associated with the injuries caused by the accident.  E.g., Tr. 208.  Plaintiff was treated with pain medication and was referred to Paladin Physical Therapy for physical therapy.  From October 2012 through December 2012, she attended physical therapy; the treating notes reflect some improvement in the level of pain and limitation of motion in her lower back and neck, although severe activity limitations persisted, including a complete inability to lift more than one pound or to lift and carry anything in her hand.  Tr. 269-76.  By January 2013, Plaintiff had stopped going to physical therapy because of the cost.  Tr. 295, 408.  By early 2014, Plaintiff was still complaining of difficulty sleeping due to pain, with limited range of motion, knee issues and a right shoulder tear.  Tr. 408-09.  Also as of early 2014, Plaintiff had never had any mental health treatment, except for an occasional prescription for an anti-depressant; the only mental health symptoms in the treating record to that date are occasional reports of depression.  In addition, as far as the Court's review reveals, the treating record as of early 2014 contains nothing reflecting Plaintiff's horrendous experiences in Cambodia many years before.

Because of the references to depression in some of the treating notes, Plaintiff was sent to an expert psychologist, Dr. Louis A. Cerbo, for a consultative examination, which was performed on November 23, 2013, with the assistance of an interpreter.  Tr. 403.  To Dr. Cerbo, Plaintiff (for the first time as far as the record reveals) disclosed the horrifying details of what she endured in Cambodia.  Tr. 403-05.  Based on this clinical interview and a mental status examination, Dr. Cerbo diagnosed PTSD, as well as depression and a learning disability (due to Plaintiff's illiteracy).  Tr. 405.  His report notes that Plaintiff was unwilling to engage in conversation about her Cambodian experiences "due to poor coping skills to discuss such horrific trauma."  Id.  Based on her difficulty in even speaking about her ordeal, as well as the language barrier, he opined that her prognosis was

"poor to guarded" because it would be "difficult for her to engage in psychotherapy." Id. He assigned a Global Assessment of Functioning ("GAF") score of 43,[2] and opined that Plaintiff would need a representative to manage her funds, as well as that her mental impairments significantly limit her ability to perform activities of daily living, constrict her interests, create difficulties in performing tasks requiring concentration and significantly affect the ability to complete tasks. Tr. 405-06.

These records (principally, those from Coastal Medical, University Orthopedics and Paladin Physical Therapy, as well as Dr. Cerbo's report) were reviewed initially and on reconsideration by two SSA expert physicians and two expert psychologists. Noting references to walking forty-five minutes and gardening, as well as the complete absence of mental health treatment, they found severe spinal, anxiety, affective and learning disorders, and opined to an RFC permitting light work and the ability to perform simple tasks with regular breaks; they found no manipulative or communicative limitations. Tr. 67-68, 69-71, 80-85. While they acknowledged the symptoms of PTSD reflected in Dr. Cerbo's report, they rejected PTSD as an impairment because of Plaintiff's years of work preceding the car accident. Tr. 68, 81. Accordingly, they did not even consider whether Plaintiff's post-accident PTSD symptoms meet or equal the PTSD Listing (12.15).

The SSA examiners completed their work in June 2014. As a result, they did not see the October 2014 treating record from Plaintiff's brief admission to Rhode Island Hospital, where she presented with serious, potentially psychiatric, symptoms (right-side pain, weakness, confusion and altered mental status) that resolved in twenty-four hours. Tr. 412-36; see Tr. 426 ("unclear whether

---

[2] A Global Assessment of Functioning ("GAF") score in the 41-50 range indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). By the time of Dr. Cerbo's examination, the DSM had eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5")). Further, a GAF score assigned by a one-time evaluator has limited weight. See Vieira v. Berryhill, C.A. No. 1:16-CV-00469, 2017 WL 3671171, at *2 (D.R.I. Aug. 25, 2017) ("[T]he extent to which an adjudicator can rely on the GAF score as a measure of impairment severity and mental functioning depends on: (1) whether the GAF rating is consistent with other evidence; (2) how familiar the rater is with the claimant; and (3) the rater's expertise.").

there may be a psychiatric component to this problem list").  They also did not see any of the treating

records and opinion evidence from CCAP, where Plaintiff's treating provider was Nurse Practitioner

David Greenblatt.[3]  Tr. 441-80.  Nurse Greenblatt's treating notes are detailed and loaded with the

results of clinical observation, physical examination and testing.  They reflect pain and joint swelling

in the knees; significant knee pain on palpation and manipulation; antalgic gait; a complete absence

of right arm range of motion and the complete inability to lift the right arm; and extremely serious

PTSD.  E.g., Tr. 449, 454, 457, 470-71.  The notes include Nurse Greenblatt's observation that the

knee and shoulder pain, which he found resulted in significant functional limitations, appear to be

related to specific torture to those areas of Plaintiff's body by the Khmer Rouge.  E.g., Tr. 460.  The

2014 CCAP treating note references to torture are consistent with those in Dr. Cerbo's 2013 report.

E.g., compare Tr. 460 ("Was tortured by KR who cut tendons as a mean to torture and wound her"),

with Tr. 405 ("she was threatened to have legs sort off by the Khmer Rouge").

Based on his clinical observations and testing, Nurse Greenblatt submitted an opinion dated

April 9, 2015.  Tr. 437-40.  In it, he opined that PTSD and depression affect Plaintiff's physical

condition; that she cannot stand for more than one hour, cannot sit or stand/walk for more than two

hours, and must use a cane; that she is limited to work with a sit/stand option and must take frequent

breaks; that she cannot lift even ten pounds and effectively cannot use her right hand, fingers or arm;

and that she cannot twist, stoop, crouch or climb ladders.  Tr. 438-39.  The Greenblatt opinion was

rejected by the ALJ in favor of those of the SSA examiners at the reconsideration phase.  Tr. 23-25.

## II.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

---

[3] Plaintiff switched from Coastal Medical to CCAP in April 2014 because CCAP was closer.  Tr. 470.

evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.  <u>Brown</u>, 71 F. Supp. 2d at 30; <u>see also</u> <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30.  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  <u>Id.</u> at 31 (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  <u>See</u> <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

## III.  <u>Disability Determination</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.      Five-Step Analytical Framework

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. 20 C.F.R. § 404.1520(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims). That is, once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

**B.     Treating Physicians and Other Sources**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist is not an "acceptable medical source."[4] 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner, cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects. Id. at *4.

## C. Medical Experts

ALJs may ask for and consider opinions from medical experts. 20 C.F.R. § 404.1527(e)(2)(iii). Use of a medical advisor in appropriate cases is a matter left to the Commissioner's discretion; nothing in the Act or regulations requires it. Rodriguez Pagan, 819 F.2d at 5 (citing Richardson, 402 U.S. at 408). The regulations provide that an ALJ has the discretion whether to obtain and consider opinions from medical experts in order to determine an applicant's RFC. Laroche v. Colvin, No. CV 15-226-M-LDA, 2016 WL 1271475, at *4 (D.R.I. Mar. 30, 2016) (citing 20 C.F.R. § 404.1527(e)(2)(iii)). While it is settled law that an ALJ

---

[4] Applicable to claims filed after March 27, 2017, new regulations expand the list of acceptable medical sources to include, for example, licensed advance practice registered nurses and licensed physician assistants. 20 C.F.R. §§ 404.1502(a)(6-8). It is unclear whether this change would render Nurse Greenblatt able to establish the existence of a medically determinable impairment if this claim had been filed in July 2017 instead of in July 2013.

cannot make medical judgments, as long as the ALJ relies on substantial evidence for his RFC determination, the argument that he should have called a medical expert is unavailing.  Phan v. Colvin, No. CA 13-650L, 2014 WL 5847557, at *11 (D.R.I. Nov. 12, 2014) (internal citations omitted).  However, when a claimant has sufficiently put her functional inability to perform her prior work in issue, the ALJ must measure the claimant's capabilities.  Hall v. Colvin, 18 F. Supp. 3d 144, 151 (D.R.I. 2014) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996)).  To make that measurement, an expert's RFC evaluation is essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.  Manso-Pizarro, 76 F.3d at 17 (citing Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991)).  "Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substitute[s] his own judgment for medical opinion."  Hall, 18 F. Supp. 3d. at 151 (quoting Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007)).

## IV.    Analysis

### A.    ALJ's Step Two and RFC Findings

The ALJ acknowledged that the SSA non-examining physicians and psychologists understated Plaintiff's limitations; by contrast with their light/mild social limitation findings, the ALJ found that she could perform only sedentary work and had moderate social limitations.  Tr. 24.  Yet he adopted their omission of PTSD at Step Two, rejecting Dr. Cerbo's PTSD diagnosis.  Tr. 18-19. As a result, his RFC findings completely ignore Nurse Greenblatt's opinion that PTSD affected Plaintiff's physical limitations, including her inability to use her right arm and hand.  The ALJ also entirely rejected the balance of Nurse Greenblatt's opinion based on his status as a non-acceptable medical source and on the finding that it is "not supported by, or consistent with, the longitudinal record."  Tr. 24.  As a result, Plaintiff's inability to use her right arm was found to be non-severe at

Step Two and is missing from the RFC. Because I find that error tainted both of these determinations, I recommend that the case be remanded.

I begin with what seems to be Plaintiff's overarching impairment, but which is almost entirely absent from the ALJ's disability analysis – PTSD. Following the lead of the SSA non-examining psychologists, the ALJ's decision focuses only on depression and anxiety, which are not the same as PTSD. Although PTSD has a close relationship with anxiety disorder, it is a separate mental impairment from both anxiety and affective disorders. Diagnostic and Statistical Manual of Mental Disorders 271-80 (5th ed. 2013) ("DSM-5"). As a result, it is listed separately from depressive disorder (Listing 12.04) and anxiety disorder (Listing 12.06) in the Social Security Disability Evaluation Listings for Mental Disorders/Adult. There, it sits in its own classification – "trauma and stressor-related disorders," codified as Listing 12.15. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.15. According to the diagnostic criteria, Listing 12.15 is applicable only if there has been exposure to "death, serious injury, or violence." Id. § 12.15(A)(1)(a).

Apart from his rejection of the Cerbo GAF of 43 because a GAF is not a "precise functional assessment,"[5] Tr. 24 n.2, the ALJ's reasons for rejecting Dr. Cerbo's entire report – that Dr. Cerbo relied only on subjective complaints and that the Cerbo findings are inconsistent with the longitudinal record – do not withstand scrutiny. For starters, the ALJ is wrong in labelling a clinical interview and mental status examination performed by a qualified professional like Dr. Cerbo as a mere recital of subjective complaints. To the contrary, these clinical diagnostic techniques are well accepted as the basis for a psychologist's opinion. See 20 C.F.R. § 404.1505(g); Coulombe v. Colvin, C.A. No. 14-491ML, 2016 WL 1068875, at *2 (D.R.I. Feb. 19, 2016) (mental status examination is objective assessment of mental ability), adopted, CA 14-

---

[5] The ALJ is right not to rely exclusively on Dr. Cerbo's GAF score of 43; by the time Plaintiff met with Dr. Cerbo, the GAF scoring rubric had been abandoned with the publication of DSM-5. See n.2, *supra*.

491 ML, 2016 WL 1069057 (D.R.I. Mar. 17, 2016); <u>Shaw v. Colvin</u>, No. C13-917-RSM, 2014 WL 1588623, at *7 (W.D. Wash. Apr. 18, 2014) (medically acceptable clinical diagnostic techniques include clinical interview by examining psychologist).  Further, Dr. Cerbo's diagnosis of PTSD is consistent with and supported by the longitudinal treating records from CCAP,[6] which includes both the diagnosis of PTSD and similar descriptors of some of Plaintiff's medically relevant experiences in Cambodia.  And Plaintiff's failure to talk about her experiences in Cambodia to other medical providers (such as those at Coastal Medical) is reflective of one of the diagnostic criteria of the impairment ("[a]voidance of external reminders of the event," 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.15(A)(3)); her unwillingness to discuss these horrific experiences is specifically noted by Dr. Cerbo as a reason for her poor to guarded prognosis.  Tr. 405.

The ALJ's reliance on the SSA examiners is no cure for these errors.  Both of the SSA psychologists chose to ignore Dr. Cerbo and his PTSD diagnosis because the treating record they saw makes no mention of it as a diagnosis and because Plaintiff was able to work before being injured in the accident.  The SSA psychologists were unaware of the PTSD diagnosis in the CCAP record, including Nurse Greenblatt's references to the relationship between the knee and shoulder pain triggered by the automobile accident and the Khmer Rouge torture, as well as Nurse Greenblatt's opinion regarding PTSD's exacerbating impact on Plaintiff's physical impairments.  Nor did they see the October 2014 Rhode Island Hospital record reflecting a brief affliction with what seemed to be serious mental symptoms.  As a result, it was error for the ALJ

---

[6] The ALJ is also wrong about the balance of the record; the other medical records are not inconsistent with Dr. Cerbo's findings in that they refer to Plaintiff's depression, tearfulness, memory loss and difficulties with concentration.  Tr. 286, 299, 301; <u>see</u> Tr. 208 (symptoms include fatigue, depression, memory loss).  However, it appears that Plaintiff did not mention her Cambodian experiences to Dr. Sayeed at Coastal Medical or to Dr. Robertson at University Orthopedics.  As a result, neither references PTSD.

to rely on their rejection of PTSD. <u>Padilla v. Barnhart</u>, 186 F. App'x 19, 22-23 (1st Cir. 2006) (per curiam) (error for ALJ to rely on consulting physicians who had incomplete medical record); <u>Cruz v. Astrue</u>, C.A. No. 11-638M, 2013 WL 795063, at *13 (D.R.I. Feb. 12, 2013) (error for ALJ to rely on examining physicians who opined based on record assembled before rheumatoid arthritis was diagnosed), <u>adopted</u>, C.A. No. 11-638-M, 2013 WL 802986 (D.R.I. Mar. 4, 2013).

Because of the error in ignoring Dr. Cerbo and relying instead on the SSA experts with respect to PTSD, the ALJ entirely omits PTSD from his Step Two consideration. He did not even mention the PTSD Listing (12.15), nor did he include the effects of PTSD on Plaintiff's physical impairments in developing his RFC. Therefore, this is not a circumstance where a Step Two omission is harmless because the limitations caused by the omitted impairment are woven into the RFC.[7] <u>See</u> <u>White v. Colvin</u>, No. CA 14-171 S, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015). Rather, this Step Two error requires remand so that the ALJ can appropriately consider the PTSD diagnosis and make a finding on whether it is a medically determinable impairment that had more than a minimal impact on Plaintiff's ability to perform basic work. If it is, the ALJ should procure the medical expertise sufficient to allow him to make a determination at Step Three whether Plaintiff's PTSD meets or medically equals the criteria of Listing 12.15, as well as to incorporate its effects into the RFC.

An additional and equally consequential error taints both the ALJ's Step Two and RFC determinations: the unsupported finding that Nurse Greenblatt's opinion, particularly regarding

---

[7] Relatedly, the Commissioner also argues that Plaintiff has failed to explain how the error in ignoring the Cerbo PTSD opinion would have led to a different outcome. This argument is unavailing. Apart from the other debilitating limitations noted in the Cerbo report, <u>e.g.</u>, Tr. 406 ("ability to . . . engage in any physical activities are significantly limited due to her physical stamina and pain"), this argument founders because Nurse Greenblatt's opinion posits that PTSD has exacerbated the effect of the right-side pain (affecting the use of the right arm/hand) that was triggered by the automobile accident. The vocational expert's testimony confirms that, if the Greenblatt arm/hand limitations are credited, Plaintiff must be found to be disabled. Tr. 512; <u>see</u> Tr. 515 (ALJ agrees that, if he accepts Greenblatt opinion, he must find that Plaintiff is limited to less than sedentary work and is disabled).

Plaintiff's inability to use her right arm and hand, is contrary to the longitudinal record.[8]  While Nurse Greenblatt may not be an acceptable medical source, his opinion is entirely consistent with his treating notes, which in turn are well grounded in appropriate clinical findings.  His opinion is also consistent with Dr. Cerbo's report with respect to PTSD.  And his well-documented findings about Plaintiff's inability to use her right arm or hand – as reflected in both his opinion and in his treating records – are entirely consistent with the detailed notations in the Paladin physical therapy record.  Nor are they contradicted by the Coastal Medical records.  See, e.g., Tr. 297 (shoulder pain 8/10 with arm movement), Tr. 408 (since car accident, pain in right shoulder and left knee, "pain w/ lifting arm").  Accordingly, the ALJ should have afforded more weight, perhaps substantial weight, to his observations on the severity and functional effects of Plaintiff's impairments.  20 C.F.R. § 404.1527(f); SSR 06-03p, 2006 WL 2263437, at *2-3; see Baron v. Astrue, No. 11 Civ. 4262(JGK)(MHD), 2013 WL 1245455, at *26 (S.D.N.Y. Mar. 4, 2013) (recommending remand based on ALJ's failure to consider opinion provided by nurse practitioner), adopted, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013).  Further, with no other medical professionals opining on Plaintiff's condition during the period covered by the Greenblatt opinion, the ALJ's outright rejection of it rests inappropriately on his lay evaluation of its content.  See Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 7 (1st Cir. 1988) (ALJ, as a lay fact finder, lacks the expertise to make a medical conclusion).

---

[8] The ALJ's Step Two discussion of the Greenblatt finding that Plaintiff was completely unable to use her right arm and hand recites another equally unfounded reason to discount it.  Tr. 19.  Specifically, the ALJ relies on a reference in Nurse Greenblatt's November 10, 2014, note – "[h]as not been to PT," Tr. 444, – to imply that the shoulder injury was so minimal that it did not need any significant treatment.  This finding is contradicted by the balance of the record, which contains seventy-two pages of records reflecting physical therapy.  Tr. 213-85.  It ignores the uncontradicted evidence that, by the time she was seeing Nurse Greenblatt, she had stopped physical therapy due to the cost, not because of the lack of need for treatment.  See Tr. 295, 408.  And it completely ignores the Paladin physical therapy findings that, despite measurable progress in other areas affected by the accident, after months of therapy, Plaintiff remained completely unable, for example, to perform the function of "[l]ifting and carrying objects in the hand."  Tr. 280.

Based on the foregoing, in addition to consideration of PTSD as discussed above, I recommend that on remand the ALJ be directed appropriately to consider the Greenblatt opinion, including its well-supported observations of Plaintiff's inability to use her right hand, arm or fingers, her limitations on walking and the impact of PTSD on these physical impairments, with particular attention to Nurse Greenblatt's observation that there is a direct link between some of Plaintiff's physical symptoms triggered by the accident and the torture that is part of the foundation for her PTSD. Because of the complexity of these medical issues, I recommend that the Court's remand order require that a medical expert be procured to assist with the Step Two severity analysis, with any potential Step Three consideration and in the formulation of an RFC that is appropriately grounded in substantial evidence. See Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro, 76 F.3d at 17 ("[A]n expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.")).

### B. ALJ's Prior Work Finding

Because of Plaintiff's language and comprehension limitations, the ALJ struggled to get basic information about her prior work as a jewelry assembler. Seizing on Plaintiff's obviously confused testimony[9] that she was trained for "about one week" to do this job, Tr. 50, the ALJ found that, as performed by Plaintiff, the job of jewelry assembler was unskilled, even though Plaintiff's work history report describes the jewelry assembly work she did as requiring her to "[u]se technical knowledge or skills," Tr. 164, and the Dictionary of Occupational Titles ("DOT") characterizes this work as semi-skilled. U.S. Dep't of Labor, Dictionary of Occupational Titles, Vols. I, II 700.684-014 (jewelry assembler) (4th ed., Rev. 1991), 1991 WL 678906; see SSR 82-41, 1982 WL 31389, at

---

[9] Plaintiff's initial answer to this question was: "They train a little bit, but they not much, like, two or three months they train . . . . About two or one week and . . . ." Tr. 50. It is impossible to tell if this almost incomprehensible statement is the result of Plaintiff's confusing answer or the interpreter's error. The transcript then reflects a cacophony of speakers, including the vocational expert asking for clarification and the ALJ chiding the interpreter for an untranslated conversation with Plaintiff. Id. Next, the ALJ pressed Plaintiff to agree that she was trained to do jewelry assembly for "about one week." Id. In response, Plaintiff said, "Yes." Tr. 51.

*2 ("semiskilled occupations require more than 30 days to learn"). The ALJ ignored the work history report, discounted the first part of Plaintiff's first answer to the question about training and disregarded the DOT classification, to find that Plaintiff's prior work, as performed, was unskilled. Based on this finding, the ALJ concluded that, despite her limitations, Plaintiff could still work as a jewelry assembler, as the job was performed when she did it from 2003 to 2008. Tr. 25. This is not harmless error. If the ALJ had relied on the DOT classification of jewelry assembly work as semi-skilled, Plaintiff's inability to perform any but simple, repetitive tasks would have precluded this job at Step Four and resulted in a finding of "disabled" under Rule 201.02. See 20 C.F.R. Pt. 404, Subpart P, App. 2 § 201.02.[10]

The Court is troubled by the many obvious communication issues that recur throughout the transcript of the ALJ hearing; these cast serious doubt on the appropriateness of the ALJ's reliance on an answer that not only came after a plainly confusing interaction with the interpreter, but also that runs contrary to the DOT and is inconsistent with the information in Plaintiff's work history report. Since this case must be remanded because of the Step Two/RFC errors discussed above, I also recommend that there be further proceedings, with the assistance of a Cambodian interpreter, to develop the record regarding Plaintiff's prior work as a jewelry assembler.

## V.   Conclusion

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 11) be GRANTED and the Commissioner's Motion to Affirm Her Decision (ECF No. 17) be DENIED.

---

[10] Plaintiff also highlights the incongruity of the ALJ's reliance on his assumption that Plaintiff's work as a jewelry assembler was sedentary despite her inability to answer the question about how much she was required to lift while performing that job. The Commissioner correctly points out that Plaintiff's attorney specifically confirmed the nonexistence of "any evidence suggesting that [the job of jewelry assembler as performed] was more than sedentary." Tr. 55. Accordingly, this argument is waived. Ventura v. Colvin, No. 6:16-cv-16, 2017 WL 1397130, at *14 (S.D. Tex. Feb. 27, 2017), adopted, 2017 WL 1397131 (S.D. Tex. Mar. 30, 2017) (collecting cases holding that failure to challenge past relevant work determination at hearing amounts to waiver).

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 18, 2017